THE STATE v. WESLEY ROBINSON, Appellant.

Division Two, January 4, 1915.

1. **MOTION TO QUASH INFORMATION: Names of Witnesses Indorsed After Filing: Time to Investigate.** Where a defendant charged with murder moved to quash the information on the ground that he had not had sufficient time to investigate additional witnesses whose names had been indorsed on the back of the information after it was filed, and to the court's offer to allow the case to go over in order to afford him more time his attorney replied that he did not care to have it put over, and the court then overruled the motion to quash and the trial proceeded to conviction, the court's action was fair and did not violate or prejudice any of the defendant's rights.

2. **CONFESSION: Evidence: Presence of Defendant's Attorney.** A confession made by an accused is admissible in evidence despite the fact that his attorney was not present when it was made, there being no showing that other than fair means were used in obtaining it or that he asked for and was denied the presence of his attorney.

3. **MURDER: Evidence: Appeal.** The evidence in a trial for murder *held* to support a conviction.

Appeal from Jackson Criminal Court.—*Hon. Ralph S. Latshaw,* Judge.

AFFIRMED.

*L. A. Knox* for appellant.

*John T. Barker*, Attorney-General, and *S. P. Howell* for the State.

WILLIAMS, C.—Upon an information charging him with the murder of his wife, Mary Robinson, the defendant was tried in the criminal court of Jackson county, found guilty, and his punishment assessed at death. Defendant duly perfected an appeal to this court.

Evidence introduced by the State tended to establish the following facts: At the time of the tragedy defendant lived at 2213 Michigan avenue, Kansas City, Missouri. His family consisted of his wife and her two daughters by a former marriage, Alma and Massie Felton. Alma was eleven years old and Massie was eight years old. The family occupied three rooms on the second floor of a two-story house at that number. A small shed was located a short distance back of the house. The tragedy occurred about midnight on the evening of April 11, 1913. Early that evening, the deceased, accompanied by her two daughters, went to the home of Jane Hill, a short distance from defendant's home, apparently for the purpose of a social visit. Massie Felton in her testimony referred to Jane Hill as "Aunt Janie." About 11:30 o'clock on the night in question, deceased and her daughter Alma left the neighbor's home to return to their home. Massie remained over night with her Aunt Jane. The next morning Massie returned home but did not find her mother or sister there. The defendant was there and the witness asked him as to the whereabouts of her mother and her sister and he replied that they had gone to work out on Gilham Road. Massie never saw her mother or sister alive after they left Jane Hill's home at the time above mentioned.

A month later a woman telephoned the police station and told the policeman at the desk that it had appeared to her in a dream that a woman's body had

been buried in a shed back of a house located at 2213 Michigan avenue. There was some evidence tending to show that Jane Hill was the woman who telephoned the police. Three police officers were thereupon detailed to make an investigation of the premises in question. Upon arriving at the premises, the officers noticed something projecting from the ground in the shed. Some of.the earth was removed with a shovel and it was discovered that a woman's body was there buried. The coroner was immediately notified and he, in company with an undertaker, arrived upon the scene and disinterred the body. The body was that of Mary Robinson, wife of the defendant. The arms and legs had been severed close to the trunk of the body. One leg was buried with the body but the two arms and other leg were missing. The body was later removed to an undertaking establishment.

The police arrested Jane Hill on suspicion and seven days later arrested the defendant. At the time of his arrest the defendant was staying at a stone quarry camp on Mouse Creek, six miles west and two miles south of Lee's Summit, Missouri, at which place he was employed as a workman. The arrest was made about eleven o'clock at night by three policemen and the defendant was returned to police station No. 6 at Kansas City on the same night. Upon being arrested, the defendant gave some money to his tent mate and said: "Charley, you can have this money, I won't see you no more." Upon his arrival at police headquarters, upon the night of his arrest, defendant was asked by the police officers as to the whereabouts of his stepdaughter Alma Felton. At first, defendant denied all knowledge as to her whereabouts, but later stated that Jane Hill had killed the little girl by choking her and that he had taken the body of the little girl down to a pasture and buried it. The defendant further stated to the officers that he had strangled his wife to death and that he and the Hill woman had

buried his wife that night but did not have time to bury the little girl so they waited until the next night to bury her. Defendant further admitted to the police officers that after his wife was dead Jane Hill held his wife's limbs while he cut them off with a butcher knife and that the same operation was performed on the body of the little girl and that they burned the amputated limbs in a stove at his house. It was about three a. m., on the night of the arrest, when the defendant made the above confession, and immediately thereafter three police officers took the defendant to the pasture where he claimed the little girl was buried. A small lake was located in the pasture. Upon reaching the lake the defendant said: "You see that willow tree there, right there at the edge of the water?. There is where the body of Alma is buried." The officers returned the defendant to the police station and the next morning about ten o'clock took him back to the lake in the pasture and defendant again pointed out the spot where he said the little girl was buried. An excavation was thereupon made at the point indicated and the mutilated body of the little girl was disinterred. The legs and arms were missing.

Defendant's trial was begun on the 14th day of July, 1913. Two or three days preceding the time of the trial the defendant was taken to the office of the prosecuting attorney so that the prosecuting attorney might interrogate him concerning the implication of the Hill woman in the murder. During the time that the defendant was present in the office of the prosecuting attorney, the following persons were also present and heard the conversation between the prosecuting attorney and the defendant: James McCormack, deputy marshall; G. K. Wallace, reporter for the Kansas City Post; C. H. Thompson, reporter for the Kansas City Star; and Frank Faris, the stenographer who took down the confession made by defendant. Defend-

ant there admitted that he killed both his wife and
stepdaughter and stated that Jane Hill had nothing
to do with the murder. Thereupon the prosecuting at-
torney began to ask the defendant questions and the
defendant made answers to them. The questions and
answers were taken down by a stenographer and im-
mediately thereafter were transcribed into typewrit-
ing and handed to the defendant; the defendant stated
that he could not read. The statement was then read to
him by Mr. Thompson, the reporter for the Kansas
City Star, and when the reading was finished, defend-
ant said the statement was correct. The defendant
was unable to write and he signed the statement by his
mark which was witnessed by all of the above named
persons. All of the above persons testified at
the trial except the prosecuting attorney and Mr.
Thompson. It appears that Mr. Thompson was en
gaged in newspaper work in another state at the time
of the trial. The attesting witnesses testified that, be-
fore the defendant made the statement, the prosecut-
ing attorney told him that he was not compelled to
make a confession but that if he did make a confession
it would be used against him at the trial; that no
threats were used nor were any promises or offers of
reward held out to the defendant to induce him to make
a confession but that his confession was voluntarily
made. All of the evidence above referred to concern-
ing the murder of the little girl was admitted in evi-
dence without objection on the part of the defendant.
Later when the State offered further evidence showing
defendant's implication in the murder of the little girl,
the defendant objected, and the court excluded any
further reference to the murder of the little girl. The
court also gave an instruction to the jury that they
should not consider any evidence other than that con-
cerning the death of the wife.

The written confession above referred to was
properly identified and introduced in evidence over the

objection of defendant. The written confession contained no reference to the murder of the little girl. In this statement the defendant admitted that his wife returned home between eleven and twelve o'clock on the night of the tragedy; that at the time he was in bed asleep; that her coming in awakened him. In a short time his wife came to bed. He waited until his wife had gone to sleep and then got up and sat on the edge of the bed for a few minutes. He then grabbed his wife by the throat; put his knees on her stomach and choked her to death. This took only a minute or two. Defendant then left the body of the deceased and sat on a chair for about fifteen minutes to think over the matter and to decide what he would do with the body. He then examined the body and raised the window so the body would cool. Then he built a fire in the stove and made himself some coffee. After the body had cooled, he concluded that it was too heavy for him to carry away, so he went to the kitchen and procured a butcher knife and amputated the limbs from the body. One leg and the two arms he burned in the stove. It was then about three o'clock a. m., and he thought he would not have time to burn the other leg. He then buried the trunk and the remaining leg. He stated that his reason for killing his wife was jealousy and that he and his wife were both jealous of one another. The defendant did not offer any evidence.

In his brief appellant urges but two points as grounds for reversal. These points are: (1) That the court erred in overruling appellant's motion to quash the information; (2) That the court erred in admitting in evidence over the objection and exception of appellant the written confession of defendant. These will be discussed in their order.

I. Concerning the motion to quash it appears that on July 11, 1913, the prosecuting attorney en-

Information:
Motion to Quash:
Names of Witnesses
Indorsed After
Filing.

dorsed upon the back of the information the names of additional witnesses and on said date notified defendant's attorney of said additional endorsements. The trial was begun on July 14th, and upon that date defendant filed a motion to quash the information on the ground that the additional names had been endorsed on the back of the information after the same was filed, and that defendant had not had sufficient time in which to investigate these additional witnesses. From the bill of exceptions, it appears that, before passing upon the motion to quash, the court informed the defendant in effect that if he desired more time to investigate the additional witnesses he would allow the case to go over so as to grant the defendant sufficient time for that purpose. Thereupon defendant's counsel replied to the court that he "did not care to have it put over." The court then stated that if defendant did not want the case put over he would overrule the motion and the case would proceed to trial. This was accordingly done. It therefore clearly appears that defendant, under the circumstances presented, was treated with the utmost fairness by the trial court and that the action of the court in overruling the motion to quash did not violate or prejudice any of defendant's rights. [Secs. 5057, 5097, R. S. 1909; State v. Barrington, 198 Mo. 23, l. c. 70; State v. Jeffries, 210 Mo. 302, l. c. 322; State v. Rasco, 239 Mo. 535, l. c. 553.]

II.  In support of his contention that the court erred in admitting in evidence his written confession, appellant does not claim that the confession was obtained from him by duress or unfair promises, but bases his contention upon the fact that his attorney was not present when the confession was made and that his said attorney was not notified of the contemplated in-

Confession
as Evidence.

terview between the prosecuting attorney and the defendant, so that he might be present. It is not contended that defendant at any time before or at the time of making said confession requested or desired the presence of his said attorney. We know of no rule that would preclude the prosecuting attorney from interrogating, outside of the presence of his counsel, a person charged with crime. If it should be claimed by a defendant that his alleged confession had been obtained by unfair means, it would be no doubt some corroboration of such a claim if it should appear that before, or at the time of, making the confession, he had requested and been denied the privilege of having his counsel present. But the mere absence of his counsel at the time of making the confession would not impair the admissibility of the confession otherwise regularly and fairly obtained. In the present case there is no evidence that the confession was obtained in such a manner as to render it inadmissible, but on the other hand, it clearly appears, from the testimony of witnesses having no connection with or interest in the prosecution, that threats or unfair promises were not employed, but that the confession was voluntarily made by the defendant after the prosecuting attorney had warned him that he was not compelled to give information against himself and that, if he did, his statements would be used against him upon the trial of the case., The confession was properly admitted in evidence. [State v. Wooley, 215 Mo. 620, l. c. 683; State v. Wilson, 223 Mo. 173, l. c. 188.]

III. In the motion for a new trial it is claimed that the evidence is insufficient to support the verdict. There was testimony aside from the con-

Evidence.   fession, tending to establish the *corpus delicti,* and the evidence as a whole was clearly sufficient to support the verdict. [State v. Wooley,

supra, l. c. 671; State v. Skibiski, 245 Mo. 459, l. c. 463.]

Aside from the alleged errors urged by appellant in his brief we have carefully reviewed the entire record in the case and find no other point which merits discussion. It appears that the defendant has been accorded a fair and impartial trial and that the judgment must be affirmed and the sentence executed. It is so ordered. *Roy, C.,* concurs.

PER CURIAM.—The foregoing opinion of WILLIAMS, C., is adopted as the opinion of the court. All the judges concur.